SOUTHERN RAILWAY COMPANY

*v.*

ATLANTIC COAST LINE RAILROAD COMPANY and Louisville and Nashville Railroad Company, D/B/A Clinchfield Railroad Company.

352 S. W. 2d 217.

(*Knoxville,* September Term, 1961.)

Opinion filed December 8, 1961.

SIMMONDS, BOWMAN & HERNDON, Johnson City, for appellant.

WILSON, WORLEY & GAMBLE, Kingsport, A. K. McINTYRE, Erwin, for appellee.

MR. JUSTICE BURNETT delivered the opinion of the Court.

For convenience we will hereinafter designate the parties, complainant-appellant as "Southern" and the defendants-appellees as "Clinchfield".

This suit was brought by Southern to obtain a construction of a contract entered into between the parties on August 24, 1960, under which Clinchfield granted Southern the right to joint use of Clinchfield's trackage from a point some seven miles west of Kingsport, known as Frisco, to the manufacturing plant of Tennessee Eastman Company at Kingsport, and points on Long Island and the Horse Creek area, at or near Kingsport. The controversy arose between the parties over Southern's announced intention to operate what it considered these switching operations with a crew of three railroad operators, and Clinchfield's refusal to permit such operations with a crew of less than four men. The bill was filed for

a declaratory judgment, seeking to declare the rights of these parties under this contract.

The original bill was sworn to by one of the solicitors for Southern "on information and belief", while the answer of Clinchfield was sworn to by the General Manager of this railroad "upon personal knowledge" of the affiant.

To the bill Clinchfield filed a demurrer coupled with the sworn answer as above indicated. The demurrer is based on three grounds, to-wit, (1) there is no equity on the face of the bill; (2) no irreparable damage done to Southern was shown on the face of the bill; and (3) the bill, along with the contract between the parties as exhibited thereto, shows that the parties were engaged in interstate commerce and that paragraph nine of the contract provides for arbitration of any controversy between the parties, and since no arbitration had been had Southern had not exhausted its administrative remedy and therefore had no right to judicial aid for construction of the contract.

In its answer Clinchfield admitted the execution of the contract and alleged that the operations of the trains involved in this joint trackage agreement involved interstate commerce and admitted that as alleged in the contract the agreement between the parties had the approval of the Interstate Commerce Commission. Clinchfield admitted that Southern was insisting on a right to operate its trains with a three-man crew while Clinchfield was insisting on a minimum of a four-man crew. Clinchfield further alleged that the contract specifically provided that it "shall have the entire control of operation of its * * * facilities" and further provide, "If, at any

time, in the judgment of Clinchfield additional forces are needed * * * on the jointly used facilities * * *, Southern will reimburse Clinchfield 100% of such additional expenses * * *'' Clinchfield further answered in this sworn answer on the personal knowledge of the General Manager that the standard crew required for such movements as here involved in the United States was a crew consisting of five members; that it (Clinchfield) used a five-man crew, that Clinchfield knew of no instance in which Southern used only a three-man crew for such an operation; and that a four-man crew was necessary for the safety of the operations and also for expediting the movement of trains in these yards where Clinchfield used a five-man crew.

It was also alleged by Clinchfield that while acting under a temporary injunction which was granted herein Southern in attempting to operate its train by use of only a three-man crew one of Southern's engines ran over a derail, resulting in the derailment of a Southern engine and causing substantial delay and a revision of the clearances for the operation of the Southern train over the Clinchfield tracks. It was likewise denied by Clinchfield that the administrative remedies provided in the contract for arbitration had been exhausted.

The matter came on to be heard upon motion of Clinchfield which was based on the bill and sworn answer of Clinchfield (sworn to by its General Manager on personal knowledge) and also upon lack of equity upon the face of the bill. The Chancellor held: (1) that the issue of whether or not Southern should be permitted to use a three-man crew or a four-man crew in its operations under said trackage agreement presented a dispute ''in-

volving disputed questions of fact'' and for that reason the court in the exercise of its discretion refused to entertain the original bill for declaratory judgment; (2) that Clinchfield's motion to dissolve the injunction should be sustained both upon the facts in the original bill and the sworn answer as well as upon the lack of equity on the face of the bill; and (3) that the contract executed between the parties was a contract involving interstate commerce which contained an arbitration clause and that said contract was subject to the provisions of the Federal Arbitration Act which had not been exhausted by Southern and therefore since its administrative remedies had not been exhausted under the provisions of the contract, which the court held were binding upon the parties, that the court in the exercise of its discretion should likewise refuse to entertain the suit for declaratory judgment. From this judgment Southern has appealed and assigned errors which are primarily predicated upon the dismissal of the original bill because ''Southern is bound to arbitrate under the provisions of * *'' the Federal Arbitration Act.

After reading the record, briefs, authorities cited, and some independent investigation, we have the matter for disposition.

In the first place, it is our judgment that the Chancellor cannot be put in error in holding among other things that ''Southern is bound to arbitrate under the provisions of * * *'' the Federal Arbitration Act. We say this because whether the Chancellor was right or wrong in his holding he cannot be put in error on it when he has exercised his discretion under the factual situation as well as legal situation alleged in this bill in dismissing the

bill because a declaration could only be made after a judicial investigation of disputed facts.

The power of the courts to give declaratory judgments originated in the Declaratory Judgments Act, Chapter 29, Public Acts of 1923, and the first section of this Act is codified in the present Code as sec. 23-1102. Section 9 of that Act, which is codified as Code Section 23-1108, permits the settlement of disputed facts at issue between the parties. The determination though of the issue of fact in these declaratory suits between the parties will ordinarily be relegated to the proper jurisdictional forms otherwise provided. *Hinchman v. City Water Co.*, 179 Tenn. 545, 167 S.W.2d 986. This Court though has repeatedly held in numerous cases since the enactment of the Act that where the Court does not act arbitrarily in refusing to entertain such a suit but exercises a sound discretion, neither entertaining nor denying the suit, that then the appellate court will not disturb such a finding. See *Tenn. Farmers Mut. Ins. Co. v. Hammond*, 200 Tenn. 106, 290 S.W. 2d 860, and *Southern Fire & Gas Co. v. Cooper*, 200 Tenn. 283, 292 S.W.2d 177, for numerous decisions of this Court holding as above indicated.

In Anderson on Declaratory Judgments, 2nd Ed. Vol. 2, the question is taken up by the author and discussed involving the warranting of the exercise of discretion to deny relief, particularly at sec. 387, page 935. The author says that the English cases and the New York decisions are apparently the only ones dealing with the matter wherein those courts have held "that the court may exercise its discretion and refuse declaratory relief, where it involves the determination of a complicated

question of fact." The question is then discussed at some length and the author of that work further says: "But in any event whether or not a court should exercise its discretion, by reason of the existence of a complicated question of fact, is itself a question of fact, and is a practical one to be decided, on the basis of facts of each particular case, after a careful consideration." In the 1959 Supplement to this work on Declaratory Judgments referring to the same section above referred to (sec. 387) at page 345 of this Supplement the author says "the trial court in exercise of sound discretion may either entertain or not entertain such action." By reference to our cases, the latest two are above cited, it is perfectly obvious that this Court has reached the conclusion that where there is a disputed question of fact and the trial court exercises its discretion in either considering or not considering this Court has determined that this is a discretionary fact, and on appeal where the Chancellor has exercised the proper discretion this discretion will not be disturbed.

What is meant by saying that the trial court has exercised a proper discretion? We think that it means a sound discretion, exercised, not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances of the law, and directed by the Chancellor's reason and conscience to a just result.

When we apply such a rule to the factual situation as shown in this case by the bill and sworn answer of the General Manager of Clinchfield it becomes perfectly obvious that there has been no abuse of the discretion imposed in the Chancellor herein when he dismisses this bill.

■ These facts show that the parties by their written contract have a provision for arbitration; that the general practice of railroads in this type of case is to have a five-man crew, and there has been an accident in this particular case by the use of a three-man crew. This then brings up for consideration what seems to us is perfectly obvious that arbiters naturally and normally would be men of some knowledge of what is or is not necessary in this type of situation, and thus that a board of arbitration could far better arrive at what was necessary under the situation. Such a board of practical working railroad men would have a far better opportunity of seeing and knowing what was necessary under given circumstances, the number of men needed, and things of that kind, than would a court or Chancellor who has no workable knowledge of such matters. If the court did hear this proof pro and con, he would merely have to weigh the proof on one side or the other and then determine under what the court considered the weight of the proof what was the proper thing. Thus, it seems to us that the Chancellor was clearly right in exercising his discretion here and not hearing this proof since it did involve what was apparently a rather specialized field in railroad operation.

■ Of course, in a matter heard as this one was the sworn allegations in Clinchfield's answer on personal knowledge overcomes the allegations of the bill sworn to on belief. Gibson's Suits in Chancery, 5th Ed., sec. 897, page 108.

U.S.C.A., Title 9 sec. 1 et seq., contains what is known as the Federal Arbitration Act. Section 1 of this Act defines "commerce" to mean "commerce among the

several States * * *.'' The Chancellor in dismissing the action did not foreclose the rights of the parties to arbitration hereinafter under the provisions of this Act. He held that the suit is ''dismissed but otherwise without prejudice to the rights of the parties under the contract filed as Exhibit A to said bill, said dismissal of the bill being based upon the refusal of the court, in the exercise of its discretion, to entertain jurisdiction of this cause as a proceeding for a declaratory judgment.''

Thus it is for the reasons expressed above that we must affirm the judgment below because we feel that the Chancellor cannot be put in error for refusing to exercise his discretion in consideration of this declaratory judgment suit. The suit is therefore dismissed at the cost of Southern.